ORDERED.

**Dated:  October 28, 2021**

Jerry A. Funk
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

IN RE:

SEAWALK INVESTMENTS, LLC,

       Debtor.

_____/

Chapter 11

Case No.     3:19-bk-1010-JAF

## FINDING OF FACTS AND CONCLUSIONS OF LAW

This case came before the Court for hearing on the following matters:  i) confirmation of Debtor SEAWALK INVESTMENTS, LLC's ("Debtor") Third Amended Chapter 11 Plan of Reorganization (the "Debtor's Plan") (Docs. 53, 160, 212, 282, & 472-1[1]); ii) confirmation of Creditor SKY ENTERPRISES LLC'S ("Sky") Chapter 11 Plan of Reorganization ("Sky's Plan") (Doc. 244); iii) Debtor's Motion to Value Real Property (Doc. 397); iv) Sky's Motion to Determine Amount of Secured Claim (Docs. 350 & and 487); and v) Sky's Motion to Dismiss or Convert this Chapter 11 case (Doc. 239).  Trials on these matters were held on August 26 and 27, 2020; October 15, 2020; January 28, 2021; February 18, 2021; and September 21, 2021.  (Docs. 359, 420, 432,

---

[1] Document 472-1 comprises the original plan plus three piecemeal amendments to the Debtor's Plan.

& 518).  The parties submitted briefs, responses, and replies concerning these issues.  (Docs. 474, 475, 476, 477, 478, 479, 481, & 483).  Based on the argument and evidence presented, the Court makes the following Findings of Fact and Conclusions of Law pursuant to Bankruptcy Rules 9014(c) and 7052.

## Findings of Fact

In March 2019, the Debtor filed a voluntary petition under Chapter 11 of the Bankruptcy Code.  The Debtor is a Florida limited liability company that owns a mixed-use commercial property consisting of short-term lodging and long-term residential rental spaces, as well as retail/commercial space (the "Property").  The Property is in Jacksonville Beach, Florida.  The Debtor has managed the Property as a debtor-in-possession.  The Debtor has two members/owners, an individual named James R. Stockton ("Mr. Stockton") and a company named Bebe LLC.

In November 2018, a fire occurred at the Property.  The fire was small, but a dispute arose between the first mortgage holder, NLA Jacksonville, LLC ("NLA Jacksonville"), and the Debtor as to how the insurance proceeds should be used.  This dispute and the Debtor's inability to obtain the insurance proceeds caused the filing of this bankruptcy case.  At the time of the bankruptcy filing, the Debtor was not in default on the note to NLA Jacksonville.  In November 2019, the Court entered an order governing the insurance proceeds.  (Doc. 167).  Repairs were completed, and full operation of the Property resumed in August 2020.  (Doc. 435 at 38, 51); (Doc. 449 at 26-27); (Doc. 312).

The Property also provides a location for a beaches-area rescue mission to help individuals.  The Debtor previously donated rooms to the mission.  Since the fire and this bankruptcy case, the Debtor has ceased donating its facilities so that it may fund its proposed plan.

**Valuation of the Property.**

The Property consists of .28 acres and the building, which was constructed in 1946 and is 11,516 square feet.  The Property is in the Jacksonville Beach Central Business District, on First Avenue North, between First Street and Second Street.  The Property is two hundred feet from the publicly owned SeaWalk Pavilion[2] and is one block from the ocean and the Jacksonville Beach Pier.  The Jacksonville Beaches central park is just across the street.  The Property, which is the Debtor's only income-producing asset, is located in an extremely desirable and potentially lucrative commercial area.

The Property contains twenty-six hotel rooms plus four retail/commercial spaces.  The residential rooms span two floors that form a U-shape surrounding the central courtyard area.  Four of the twenty-six hotel rooms are used as short-term Airbnb rentals.[3]  The Airbnb rentals are operated by a separate pass-through entity named Seabreeze Motel of Jacksonville Beach Inc. ("Seabreeze").  Seabreeze maintains a hotel license while the Debtor does not; however, both entities are controlled by Mr. Stockton. During the recent COVID-19 pandemic, the Debtor experienced increased demand for its Airbnb rentals which allowed it to increase its Airbnb rental rates.  (Doc. 435 at 123).  The non-Airbnb rooms are used for long-term rentals of six months or more.  The Airbnb rentals provide higher per-day revenue than the long-term rentals.  Mr. Stockton intends to increase the number of rooms used for Airbnb rentals from four to eight and has used capital to rehabilitate additional rooms.

---

[2]  https://www.visitjacksonville.com/directory/seawalk-pavilion/.

[3]  Airbnb, Inc. is an online booking platform that allows hosts (such as the Debtor) to provide guests with access to short-term rental/lodging facilities.

The Property also contains retail/commercial spaces at the two endpoints of the "U" formed by the hotel-room structure. These retail/commercial spaces face First Avenue, across from the public park, and are open to foot traffic.

A "town center" is being built next door to the Property; however, the details of this "Jax Beach Town Center" project were not entered into evidence. The Debtor's expert on valuation, Jorge Suazo ("Mr. Suazo"), testified the next-door property recently sold for $3.8 million for tear-down value. The existing structure was subsequently demolished. (Doc. 435 at 55-57). While this next-door project could increase the value of the Property, at this time, such increases are too speculative. Thus, the Court looks to the tear-down value of the next-door property as a quasi-baseline for valuing the instant Property because the two lots are similarly sized. Mr. Stockton's testimony also emphasized the opening of the Margaritaville Hotel, nearby. The import of the next-door project and the Margaritaville Hotel is that they tend to indicate the Jacksonville Beaches area is not experiencing economic decline as of the trials in these matters.

Sky's expert on valuation was Jason Ryals ("Mr. Ryals"). Mr. Ryals is a real estate broker and provided a broker price opinion (Doc. 296). Mr. Ryals used a sales-comparison approach to value the Property. Mr. Ryals used four prior sales of comparable properties in the Jacksonville Beach area. The four properties were restaurant spaces, commercial spaces, or a mixture of both. It does not appear that Mr. Ryals' comparable properties contained boutique hotel accommodations like the Property, however.

All of Mr. Ryals' comparable sales occurred prior to the recent pandemic, and his analysis did not incorporate any effects (either positive or negative) the pandemic may have had on the hospitality industry in this area. Mr. Ryals did not conduct a structural analysis of the building on

the Property, but his report notes the need for a roof replacement with an estimated cost of $92,128. (Doc. 307-71 at 5). Mr. Ryals' ultimate valuation for the Property is $2.6 million.

Mr. Suazo, the Debtor's valuation expert, is a broker and provided a broker price opinion. However, Mr. Suazo engaged in both a sales-comparison approach and an income capitalization approach. Based on the operating statements and monthly operating reports provided by the Debtor, Mr. Suazo projected the Debtor's net operating income (or earnings before interest, taxes, depreciation, and amortization) for the first five years following confirmation. Mr. Suazo based these projections on the Debtor's actual net operating income excluding costs for debt servicing and adequate protection payments made during the pendency of this case. The projected net operating income was approximately as follows: $355,000 for Year 1; $367,000 for Year 2; $379,000 for Year 3; $392,000 for Year 4; and $405,000 for Year 5. (Doc. 284 at 11). These projections assumed full or near-full operation of the Property, in a post-pandemic market environment. Mr. Suazo assumed a capitalization rate of 8.15%, an annual operating-expense increase of 2.0%, and an annual net-operating-income increase of 3.5%. (Doc. 284 at 45). The Court finds the two assumed annual increases to be broadly reasonable. The Court discusses Mr. Suazo's capitalization rate in the analysis, below. Mr. Suazo's ultimate valuation is $4.35 million. (Doc. 284 at 5). This value was derived by dividing the Year 1 net operating income by the capitalization rate—i.e., $354,609 for Year 1 divided by 0.0815 equals roughly $4.35 million.

The evidence indicates the pandemic increased short-term rentals except during March 2020, when state or local law banned all short-term hotel operations. (Doc. 435 at 124). Mr. Suazo explained the Debtor "can simply turn the units more into Airbnb and generate [ ] tremendously more income on a per unit basis rather than" as long-term rentals. (Doc. 438 at 127). He indicated "they have a track record that is improving in terms of not only the [Airbnb per-night] rate but also

[ ] the demand for [Airbnb rentals]." (Doc. 438 at 128). Buttressing this point, the Debtor incurred capital expenses to turn additional rooms into Airbnb rentals. (Doc. 449 at 28).

Finally, Mr. Stockton, testifying as the property owner's corporate representative, opined on the value of the Property. He testified that, in January 2021, he received an offer to purchase the Property for $4.3 million. (Doc. 449 at 14). He further testified that, having been involved in real estate for over forty years, "I've never, ever had a property that [ ] had been more sought after" than this Property. (Doc. 435 at 152) ("I've had people come after it at every angle possible. [I]t's constantly people trying to buy it."). The Court finds these statements credible based on Mr. Stockton's demeanor and the Property's location. Mr. Stockton believes the Property is worth between $4 and $5 million. (Doc. 435 at 153) ("I'd say closer to five million is what I believe I could sell the property for.").

**The Hapsis Trust and the Mediated Settlement Agreement.**

The Debtor's second-largest creditor is Teresa L. Hapsis Trust (the "Hapsis Trust"). The beneficiary of this trust is Gust Hapsis ("Mr. Hapsis"). The Hapsis Trust holds a prepetition debt secured by an original purchase-money mortgage on the Property (the "Hapsis Mortgage Debt"). (Claim 4). The Hapsis Trust had raised objections to the Debtor's Plan; however, those objections were settled by agreement (the "Mediated Settlement Agreement"). (Doc. 157); (Doc. 175).

The Mediated Settlement Agreement provides that the Hapsis Trust has an allowed claim of $425,000 as of the date of confirmation, which includes all post-petition fees/costs through the date of any confirmation hearing in this case. (Doc. 157 at 8). The agreement requires the Debtor to make interest-only payments of $2,125 per month to Mr. Hapsis beginning in December 2019, for five consecutive months. Upon the sixth month, the payment rises to $3,045 per month, and will include both interest and principal. The Debtor has made all adequate protection and interest-

only payments to the Hapsis Trust.  Finally, the Mediated Settlement Agreement contains a covenant granting the Trust relief from any future stay imposed under § 362 of the Bankruptcy Code.  The Mediated Settlement Agreement supersedes Section 7.15 of the Debtor's Plan to the extent Section 7.15 conflicts therewith as discussed further below.  (Doc. 435 at 33).

**Sky Enterprises.**

Sky, a single-member Delaware limited liability company, is the Debtor's largest creditor and holds a first mortgage lien on the Property (the "Primary Mortgage Debt"), second in overall priority to tax liens.  Jean Bakkes ("Mr. Bakkes") is the owner of Sky.  (Doc. 438 at 17).  Sky purchased the Primary Mortgage Debt from NLA Jacksonville on February 3, 2020, several months after the Debtor filed its initial and amended plans with the Court, which provided for full payment, with interest, to NLA.  (Doc. 413-4) (the loan purchase agreement); (Doc. 185) (the notice of transfer of claim); (Doc. 438 at 55-58) (testimony concerning the loan purchase).[4]  Sky paid NLA Jacksonville roughly $760,000 for the Primary Mortgage Debt—the full balance owed at that time.  (Doc. 413-4 at 5).  At the time of the purchase, cash collateral issues had been resolved.

When Sky first reached out to NLA Jacksonville in early 2018, NLA Jacksonville turned down the bid.  However, Sky re-approached NLA after this bankruptcy case was filed.  Sky did not seek an appraisal of the Property and did not inspect the Property prior to purchasing the Primary Mortgage Debt.  (Doc. 438 at 77).  Mr. Stockton is a personal guarantor of the Primary Mortgage Debt, and Sky has filed suit against Mr. Stockton to recover on his personal guaranty.  Process was served when Mr. Stockton entered the courthouse on the morning of the confirmation hearing on the Debtor's Plan.

---

[4] When NLA Jacksonville owned the Primary Mortgage Debt, the debt was serviced by Gulfstream Capital Servicing.

Mr. Bakkes purports to be a longtime friend of Mr. Hapsis, the beneficiary of the Hapsis Trust. In early 2018, Mr. Bakkes learned, from Mr. Hapsis, that Mr. Hapsis had not received any interest or other payments from the Debtor on the Hapsis Mortgage Debt, pursuant to a prior agreement reached between the Trust and the Debtor. (Doc. 438 at 56).[5] Mr. Bakkes' understanding was that Mr. Stockton had previously promised to pay the Hapsis Trust in full, with all accrued interest, when the Hapsis Mortgage Debt matured on or about November 2018—which incidentally coincided with the fire at the Property. Mr. Bakkes contends he was concerned the Hapsis Trust would not receive any money if the holder of the Primary Mortgage Debt were to foreclose on the Property. As a result of this "concern" for Mr. Hapsis, Mr. Bakkes reached out to NLA Jacksonville in early 2018 to inquire whether NLA would be willing to sell the Primary Mortgage Debt. (Doc. 438 at 58-59). Mr. Bakkes testified, "The intention of buying the claim was to protect [against] a first mortgage foreclosure that would foreclose out the second mortgage position [of] my friend Gust [Hapsis]." (Doc. 438 at 61). However, Mr. Bakkes was unaware the Hapsis Trust and Debtor had entered into the Mediated Settlement Agreement. (Doc. 438 at 82). Mr. Bakkes self-admittedly offered to purchase the Property as early as 2012 or 2013. (Doc. 413-5 at 7-8) (pages and lines 21:21-22:3). The Court finds no credibility in Mr. Bakkes' testimony that his sole intent was to help Mr. Hapsis.

Importantly, prior to Sky's purchase of the Primary Mortgage Debt, an agreement was reached between Sky and the Hapsis Trust, which provided that Sky "has [an] interest in acquiring the real property secured by the [Hapsis Mortgage Debt]." (Doc. 438 at 64); (Doc. 413-2 at 4-6) (the "working agreement" between Sky and the Trust). Sky agreed to pay all attorneys' fees

---

[5] The truth of the matters asserted in these statements by the out-of-court declarant, Mr. Hapsis, is not relevant to the Court's findings. However, these statements are relevant to Mr. Bakkes' understanding and state of mind, as well as Sky's intent in purchasing the Primary Mortgage Debt from NLA Jacksonville.

incurred by the Hapsis Trust related to the Hapsis Mortgage Debt. Mr. Bakkes also had his own personal attorney reach out to Mr. Hapsis "to help make sure [Mr. Hapsis]' interests are protected." (Doc. 438 at 65).

Further, after the November 2018 fire at the Property, the Debtor sought to use insurance proceeds to repair the damaged structure. Mr. Stockton testified the Debtor and NLA Jacksonville differed on how the insurance proceeds should be used and that this "dispute" was the "primary" reason for filing this Chapter 11 case. (Doc. 435 at 105-07, 191). Mr. Stockton contends that Sky was the instigator behind NLA Jacksonville's quarrel over the insurance proceeds. Mr. Stockton contends Sky involved itself with NLA Jacksonville and the Hapsis Trust for the ulterior purpose of gaining title to the Property through this bankruptcy.

**Sky's Secured Claim**

The promissory note associated with the Primary Mortgage Debt provides that [the Debtor] agrees to pay [Sky]'s attorney's fees incurred in protecting and preserving its lien and or in enforcing its rights under the note. (Sky's Ex. 1 from September 21, 2021 hearing on Motion to Determine Amount of [Sky]'s Secured Claim). Sky seeks to have the following included in its secured claim: 1) the principal balance of $741,960.76; 2) accrued interest of $19,411.64; 3) $234,616.80 in attorney's fees which Sky incurred in this bankruptcy case; 4) pre-bankruptcy attorney's fees of $3,070.60 and bankruptcy attorney's fees of $56,695.99, which NLA Jacksonville incurred (and which Sky did not pay), before Sky purchased the Primary Mortgage Debt; 5) expert witness costs of $25,000; and 6) other costs of $12,005.70, for a total secured claim of $1,092,761.49.

Brad Markey, a creditors' rights attorney who has practiced law for 28 years, testified as an expert witness on Sky's behalf. Mr. Markey reviewed the case docket and the fee statements

and opined that $250,000 is a reasonable amount for attorney's fees incurred by Sky in the case.

**Sky's Plan.**

Sky filed its plan in July 2020.  (Doc. 244).  Sky's Plan proposes to pay all allowed claims in full upon confirmation of the plan.  Sky expects this amount (not including its own claim) to equal in excess of $900,000, which it has set aside in cash in a segregated bank account.  (Doc. 438 at 21-23).  Under Sky's Plan, in exchange for paying all allowed claims in full—i.e., for paying over $900,000 for all allowed claims except its own, plus its "investment" in purchasing the Primary Mortgage Debt for $760,000—Sky would take all assets of the Debtor.  (Doc. 438 at 23); (Doc. 244 at 11).  The total amount paid by Sky would likely be approximately $1.75 million.

Following the transfer of assets, Sky would eventually evict any long-term tenants of the Property.  (Doc. 438 at 53) ("[W]e don't want to put anybody on the street, but certainly it's a commercial property that we have to put into a commercial operation.").  Sky would then rehabilitate the Property by updating the building and fixtures.  Sky would hire an outside company to run and operate the Property as a boutique hotel in Jacksonville Beach.  Mr. Bakkes and Sky have previously performed this type of work on more than twenty properties.

Finally, Sky's Plan does not provide a competitive sale mechanism.  (Doc. 438 at 71). Under Sky's Plan, no one has an opportunity to bid on the Property.  When asked why Sky's Plan did not include a competitive sale open to outside bidders, Mr. Bakkes testified: "That's not an approach that I thought of.  It's not a bad idea.  But I don't want to wait another year."  (Doc. 438 at 73).  The Court finds that a competitive sale process would, more than likely, result in a sale price far higher than what Sky would pay for the Property under its own plan, particularly in light of Mr. Stockton's testimony concerning bids he received ranging from $3 million to $4.3 million. Further, Sky would have no guarantee it would be the prevailing bidder.

Under Sky's Plan, Sky would receive property of a value greater than its allowed secured claim. Further, the worst-case scenario for Sky's "investment" in purchasing the Primary Mortgage Debt is that Sky's Plan is not confirmed, and that Sky gets paid in full over time rather than taking ownership of the Property. (Doc. 438 at 117); (Doc. 438 at 109) ("[Sky's] risk is that [the Debtor] actually gets a plan confirmed."); (Doc. 438 at 118) ("This is all a question of [ ] what type of return you get.").

**The Debtor's Plan.**

The Debtor's Plan (Doc. 472) provides for full payment of all allowed claims within nine years of confirmation. Some claims are paid much sooner, while other claims are amortized over twenty years but with final balloon payments owed in 2029 and 2030. The effective date of the plan is 180 days after the confirmation order becomes final.

Under Class 1, the Duval County Tax Collector would be paid 2018 and 2019 taxes in full over three years from the effective date of the plan, with statutory interest of 18% per annum. The Debtor has paid all taxes for 2020. Under Class 2, the plan calls for monthly principal/interest payments on the Primary Mortgage Debt based on a twenty-year amortization at 4.16% annual interest, but with a final balloon payment due in July 2030. Additionally, the plan provides that "[a]ll other covenants of any underlying note or mortgage shall not be effective after the Effective Date," as to the Primary Mortgage Debt. (Doc. 472-1 at 9).

The Hapsis Mortgage Debt is treated under Class 8, and the plan calls for monthly principal/interest payments based on a twenty-year amortization period at 6.0% interest but with a final balloon payment due in November 2021. (Doc. 472-1 at 13). The Debtor can purchase a 12-month extension for this balloon payment until November 2022, which would cost $10,000. If the

option to purchase the extension is exercised, regular monthly payments shall continue and remain payable.  (Doc. 472-1 at 14).

Class Fourteen comprises all general unsecured creditors, who would receive four equal annual payments of 25% of each creditor's allowed claim, plus interest, on the first, second, third and fourth anniversaries of the effective date of the Debtor's Plan.  Class Fifteen comprises the equity interests of Mr. Stockton and Bebe.  All remaining creditors not discussed here are insiders, family members, close friends of the Debtor, and Mr. Stockton.  (Doc. 435 at 184-85).  Generally, these claims are amortized over twenty years at 5.0% annual interest, with a final balloon payment due in October 2029. The Court finds the amortization/interest rates to be reasonable compensation for the time-value of the creditors' money, given the current market environment, based on expert testimony.  (Doc. 435 at 204-26).

## Conclusions of Law

### I.      Valuation of the Property.

"In the Chapter 11 context, [ ] § 506(a) is silent as to the method of valuation."  3 Norton Bankr. L. & Prac. 3d § 52:3 (July 2021).  The value is determined on a case-by-case basis in light of the purpose of the valuation and of the proposed disposition or use of the property[.]"  Id.  Where the intended use of the property is commercial in nature, the date of valuation should typically coincide with confirmation.  See, e.g., In re Dunson, 515 B.R. 387, 391 (Bankr. N.D. Ga. 2014).  Further, "[v]aluations of real property, like projections of income and expenses, are inherently imprecise."  In re Montgomery Court Apartments, Ltd., 141 B.R. 324, 337 (Bankr. S.D. Ohio 1992).  "Opinions realistically may differ, depending upon the method of valuation used and the nature of assumptions adopted."  Id.  "The Court 'may form its own opinion as to the value of the subject property after consideration of the appraisers' testimony and their appraisals.'"  In re

Motors Liquidation Co., 576 B.R. 325, 425 (Bankr. S.D.N.Y. 2017) (quoting In re Patterson, 375 B.R. 135, 144 (Bankr. E.D. Pa. 2007)). "[T]he Court need not choose any party's proffered appraisal wholesale but may instead pick and choose to determine 'the best way' to value the collateral." Id.

Finally, "[v]aluation of income-producing real property like that in the instant case is usually most reliably achieved by using the income approach which, reduced to its simplest terms, involves dividing the property's stabilized net operating income by a chosen capitalization rate." In re Club Assocs., 107 B.R. 385, 391 (Bankr. N.D. Ga. 1989); Montgomery Court Apartments, 141 B.R. at 338 (stating the income approach "is the most appropriate method for valuing income-producing property"); In re McGrath, 2021 WL 2405722, at *3 (Bankr. M.D. Fla. June 10, 2021) (Colton, J.) ("[T]he Commercial Property is an income producing property and the income-capitalization approach makes the most sense and should be given the most weight."); Stan Bernstein *et al.*, *Squaring Bankruptcy Valuation Practice with* Daubert *Demands*, 16 Am. Bankr. Inst. L. Rev. 161, 186-87 (2008).[6]

Here, under both plans, the Property is intended to be used as a boutique hotel. The Court finds the Property is worth at least $4.75 million given the Debtor's present net operating income. First, the Court notes the land next door sold for $3.8 million to a purchaser who promptly tore down the existing structure to start a new project. This figure provides a very rough baseline for this Property as the two properties are of roughly similar land area.

---

[6]  In general, there are three broad approaches appraisers often use to value commercial real property:  the sales-comparison (or market) approach, the cost approach, and the income capitalization approach.  Under the sales-comparison approach, "the fair value reflects the price at which comparable assets [ ] are purchased under similar circumstances."  In re Motors Liquidation Co., 576 B.R. at 427. "Under the cost approach, an appraiser 'estimate[s] the replacement cost of the current functionality that exists within the subject assets, and then adjust[s] that for various forms of obsolescence, including physical depreciation, functional obsolescence, and economic obsolescence.'"  Id. The income capitalization approach "is generally a way of assigning value to an asset based on its ability to generate cash flows."  Id.

Second, based upon his own clarifying testimony, the Court finds Mr. Suazo's capitalization rate to be excessively high (or conservative). The capitalization rate has an inverse relationship with property value. The higher the capitalization rate, the lower the value of the property. (Doc. 437 at 50). Mr. Suazo acknowledged his rate was high where he explained: "And, if you notice, the valuation has an acquisition cap rate of 8.15 percent, which for this type of property, is an appealing cap rate, going-in cap rate. Typically, they're selling for lower cap rates than that." (Doc. 435 at 75). He also testified, "I am more than convinced that [my $4.35 million valuation] is a very, very conservative valuation of this property at this time." (Doc. 457-1 at 34). Sky offered no contradictory evidence concerning capitalization rate.

Third, Mr. Stockton, who is an individual with forty years in the real estate business, testified he has received offers to sell the Property and believes he could sell the Property for close to $5 million. The Court finds Mr. Suazo[7] and Mr. Stockton credible and determines a value of $4.75 million properly recognizes the risks and presently existing profit-potential of the Property as a boutique hotel in the heart of the Jacksonville Beach Central Business District. This valuation also accounts for the recognized need to replace the Property's roof. The Court finds little credibility in Sky's sales-comparison analysis because the comparable properties are sufficiently dissimilar to the instant Property. Further, the net operating incomes and intents of the purchasers of those comparable properties are completely unknown.

---

[7] Sky's brief on valuation contends Mr. Suazo is a "biased witness" because he is long-time friends with Mr. Stockton and provided his expert services at no cost to the Debtor. (Doc. 477 at 4). However, by definition, all expert witnesses, paid or unpaid, are biased in favor of the party on whose side they testify.

## II.    Value of Sky's Secured Claim

Sky seeks to have the Court value its secured claim at $1,092.761.49, which represents the

principal balance of $741,960.76, accrued interest of $19,411.64, legal costs of $319,383.39, and

other costs of $12,005.70. Section 506 of the Bankruptcy Code provides:

> To the extent that an allowed secured claim is secured by property the value of which, after any recovery under subsection (c) of this section, is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement or State statute under which such claim arose.

11 U.S.C. § 506(b). "In other words, an oversecured creditor 'is allowed postpetition interest and

attorney's fees up to the value of the property less [the creditor's] prepetition claim.'"  In re A &

B Assocs., LP, 2019 WL 1470892, at *40 (Bankr. S.D. Ga. Mar. 29, 2019) (quoting In re

Southside, LLC, 520 B.R. 914, 920 (Bankr. N.D. Ga. 2014)).  "The Congressional intent behind

the enactment of § 506(b) 'was to ensure that oversecured creditors do not lose their reasonable

claims for attorney's fees simply due to the fact that their collateral is worth more than the

underlying claim-rather than [to serve] as a blank check for oversecureds to accrue legal fees

beyond the scope of protecting their interest ...'"  In re Monticello Realty Invs., LLC, 526 B.R.

902, 911 (Bankr. M.D. Fla. 2015) (quoting In re Reorganized Lake Diamond Assocs., LLC, 367

B.R. 858, 867 (Bankr. M.D. Fla. 2007)).  "[J]ust because a creditor authorizes legal work does not

mean that a debtor should pay for it[.]" In re Bate Land & Timber, LLC, 541 B.R. 601, 609 (Bankr.

E.D.N.C. 2015).

> In making a fee determination, the Court must consider not only the fee agreement but the overall fairness and reasonableness of the fee under all of the circumstances. Reasonable fees are those necessary to the collection and protection of a creditor's claim and include fees for those actions which a similarly situated creditor might have taken. The fees must be cost justified by the economics of the situation and necessary to preserve the creditor's interest in light of the legal issues involved. A secured creditor is not entitled to compensation for its attorney's fees for every action it takes by claiming that its rights have been [a]ffected.

In re Digital Prods. Corp., 215 B.R. 478, 482 (Bankr. S.D. Fla. 1997) (citation omitted). "The reasonableness of counsel's activities in representing a secured creditor may depend on the extent to which the creditor's secured position was jeopardized. Where a creditor is oversecured, the size of a creditor's equity cushion is a factor in the reasonableness determination. When there is only minimal risk, circumstances will generally require that counsel respond only to issues of material concern." In re Glazier Group, Inc., 2013 WL 1856305, at *3 (Bankr. S.D.N.Y. May 2, 2013).

The Court finds for the following reasons that the fees incurred by Sky in this case are entirely disproportionate to its risk and would not have been incurred by a typical creditor in Sky's position.  Most importantly, NLA Jacksonville, and subsequently Sky, was at all times over-secured and had a very significant equity cushion. Simply put, while there was a risk of default, there was no risk of loss to Sky because of the value of the Property.  The Debtor was not in default when the case was filed.  The Debtor did not challenge NLA Jacksonville's lien position.  The Debtor had filed a plan of reorganization that called for full payment with interest to NLA, and cash collateral issues were resolved, before Sky purchased the Primary Mortgage Debt.  The Court finds that Sky's singular purpose in this bankruptcy case was to wrest the Property from the Debtor, not to protect its lien.  The Court finds that a similarly situated creditor would have incurred no more than $50,000.00 in attorney's fees to protect its position.  Additionally, expert witness fees and costs are not taxable to a non-prevailing party.  In re Unnerstall, 2018 WL 1988936, at * 8 (Bankr. M.D. Fla. Apr. 25, 2018).  Accordingly, the Court finds that the value of Sky's secured claim is $811,372.40, encompassing the principal balance of $741,960.76, accrued interest of $19,411.64, and attorney's fees of $50,000.00.

### III.    Under § 1129(c), the Court must give preference to the Debtor's Plan.

As discussed in the sections that follow, the Court concludes that the Debtor's Plan is confirmable while Sky's Plan is not.  However, the Court prefaces that analysis with a discussion of § 1129(c) because this provision demonstrates the Court's broader, firm conclusions about this case.  That is, § 1129(c) provides, "If the requirements [for confirmation] are met with respect to more than one plan, the court *shall* consider the preferences of creditors and equity security holders in determining which plan to confirm."  11 U.S.C. § 1129(c) (2019) (emphasis and bracketing added).  Put simply, "[t]his case involves two competing plans of reorganization" and "only one plan can be confirmed, even if there are multiple plans that are confirmable."  In re Holley Garden Apartments, Ltd., 238 B.R. 488, 492 (Bankr. M.D. Fla. 1999) (J. Briskman).

Here, Sky's Plan is effectively a liquidation plan.[8]  Sky's Plan pays all debts in full upon confirmation and transfers all of the Debtor's assets to Sky.  Yet, Sky's Plan pays nothing to the equity holders, which is the key problem with it.  The Debtor's Plan, in contrast, pays all creditors in full over time with interest and allows the Debtor to keep its assets.  It is clear to the Court that Sky's Plan is an attempt to take advantage of the Bankruptcy Code to attain desirable real estate at a below-market-value cost.

Every creditor that voted on Sky's Plan voted to reject the plan.  (Doc. 395).  In contrast, every creditor who voted on the Debtor's Plan voted in favor of it, except for Sky itself.  The fact that both plans pay all claims in full only buttresses the need to consider the creditors' preferences, as dictated by § 1129(c).  Setting aside the preference of the Debtor's equity holders, the preferences of the creditors alone clearly favor the Debtor's Plan.  The reason for the creditors'

---

[8]  6 Norton Bankr. L. & Prac. 3d § 112:34 ("Since most cases of competing plans involve a creditor's liquidating plan, this leaves a very open question as to whether the large amount of a major secured creditor's 'preference' for its own plan is necessarily determinative, and the case law has not yet resolved this question.").

preference is that, under the Debtor's Plan, the creditors are paid over time and receive interest payments on those debts, which they would not receive under Sky's Plan.  (Doc. 435 at 179, 198). The Court finds this reasonable given the low interest-rate environment and inflationary pressures discussed in the testimony of Mr. Gaudet.  (Doc. 435 at 217).  Mr. Gaudet discussed inflation risks and "term premium."  Term premium is the premium paid for borrowing the same amount of money over a longer period.  Term premium results from inflationary pressures, default risk, and other factors.  It is undisputed that the current economy is awash in liquidity (or cash) chasing collateral and yield.  (Doc. 436 at 65) ("There's all sorts of capital sitting in banks right now making no money . . . .").  Under Sky's Plan, the creditors are paid immediately and receive no term premium to protect against the loss in value of their cash that results from inflation.  Under the Debtor's Plan, the creditors receive term premium.  The creditors could certainly take the immediate cash from Sky and put that money into a different investment vehicle to protect against inflation and other risks.  However, their preference to keep their money with the Debtor constitutes a reasonable business judgment.

Finally, confirming the Debtor's Plan over Sky's Plan makes sense because "the central purpose of Chapter 11 is to facilitate reorganizations rather than liquidations[.]" Fla. Dept. of Revenue v. Piccadilly Cafeterias, Inc., 554 U.S. 33, 37 n.2 (2008).  More broadly, "a central purpose of the Code is to [allow debtors to] reorder their affairs, make peace with their creditors, and enjoy 'a new opportunity in life with a clear field for future effort, unhampered by the pressure and discouragement of preexisting debt.'"  Grogan v. Garner, 498 U.S. 279, 286 (1991) (quoting Local Loan Co. v. Hunt, 292 U.S. 234, 244 (1934)). Sky's Plan directly contravenes these goals in order to deliver the Property into the hands of Sky.  Therefore, even assuming Sky's Plan was

confirmable (which it is not), the Court can only confirm one plan, and that plan must be the Debtor's Plan pursuant to the plain terms of § 1129(c).

### IV.    Confirmability of Sky's Plan.

"Section 1129 of the Bankruptcy Code provides that a court shall confirm a Chapter 11 plan if it complies with each of the requirements set forth therein." In re Monticello Realty Invs., LLC, 526 B.R. 902, 912 (Bankr. M.D. Fla. 2015). The plan's proponent has the burden of establishing the requirements are met. In re J.C. Householder Land Tr. #1, 501 B.R. 441, 452 (Bankr. M.D. Fla. 2013).  The Debtor and its equity holders argue Sky's Plan:  a) is not proposed in good faith as required by § 1129(a)(3); b) fails to satisfy the "best interests of creditors test" as applied to equity interest holders, under § 1129(a)(7); and c) fails to satisfy the standard for cramdown under § 1129(b)(1).  The Court concludes these arguments are meritorious as discussed below.

### A.    Whether Sky's Plan is proposed in good faith, under § 1129(a)(3).

"Although good faith is not defined in the Bankruptcy Code, good faith requires that there be a 'reasonable likelihood that the plan will achieve a result consistent with the objectives and purposes of the Code.'" In re Yates Dev., Inc., 258 B.R. 36, 43 (Bankr. M.D. Fla. 2000) (quoting In re McCormick, 49 F.3d 1524, 1526 (11th Cir.1995)).  "In finding a lack of good faith, courts have looked to whether the [plan proponent] intended to abuse the judicial process and the purposes of the reorganization provisions." In re JRV Indus., Inc., 344 B.R. 679, 684 (Bankr. M.D. Fla. 2006).  "Yet '[t]he focus of a court's inquiry is the plan itself, and courts must look to the totality of the circumstances surrounding the plan . . . ." Id.

As stated above, Sky's Plan contravenes the "objectives and purposes" of the Bankruptcy Code because the plan liquidates and destroys a viable going concern—and does so for its own

windfall-benefit.  Sky was not a prepetition creditor.  Sky purchased its claim after the Debtor filed

its initial and first amended plans with the Court, which provided for full payment, with interest,

to NLA Jacksonville.  Sky's Plan pays nothing to the equity holders and effectively purchases the

Property for approximately $1.75 million (i.e., $900,000 to $1 million as Sky's expectation for all

allowed claims except its own, plus $760,000 for purchasing the Primary Mortgage Debt in the

first place).  Even Sky's own expert valued the Property at $2.6 million.  Sky's Plan is a win-win

for Sky and a lose-lose for the Debtor, the Debtor's equity holders, and the other creditors in this

case.  There is no reasonable likelihood that Sky's Plan achieves any result consistent with Title

11.  The Court concludes Sky's Plan was not proposed in good faith but was, instead, proposed

for the purpose of obtaining title to the Property.  This is evidenced by the totality of the

circumstances including, but not limited to, the fact that Mr. Bakkes offered to purchase the

Property years before he became "concerned" for his friend, Mr. Hapsis.  Sky's Plan is not

confirmable for this reason standing alone.

     **B.**     **Whether Sky's Plan satisfies the "best interest of creditors" test as applied to equity interest holders, under § 1129(a)(7).**

"Section 1129(a)(7), known as the 'best interest of creditors' test, requires that each holder

of a claim [or interest] in an impaired class has either accepted the plan or will receive at least as

much as it would receive in a chapter 7 liquidation."  In re 431 W. Ponce De Leon, LLC, 515 B.R.

660, 674 (Bankr. N.D. Ga. 2014); 11 U.S.C. § 1129(a)(7) (2019).  Here, the question is whether

the Debtor's equity interest holders would receive as much under Sky's plan as they would under

a Chapter 7 liquidation.  Sky provided a liquidation analysis.  (Doc. 353 at 5) (Sky's liquidation

analysis).  Under Sky's liquidation analysis, general unsecured creditors and interest holders would

receive nothing in a Chapter 7 liquidation.  Sky's analysis assumes a value of $2.6 million for the

Property but discounts this price by 30% due to having to sell the Property on an expedited basis,

resulting in $1.8 million in net proceeds received by the estate.  In the end, Sky's liquidation analysis shows a negative balance of -$200,000 for the estate even *before* accounting for general unsecured claims, administrative claims, and other fees.

The Court, however, values the Property at $4.75 million.  Even using Sky's 30% discount to the sale price, which the Court finds specious, the estate would recoup $3.325 million for the Property in a Chapter 7 liquidation.  As stated above, the total of all claims is approximately $1.75 million as of the confirmation date, leaving $1.575 million for trustee fees and the equity holders. In other words, because a Chapter 7 liquidation would result in positive equity in the estate, and the equity holders receive nothing under Sky's Plan, the plan fails to meet the requirements of § 1129(a)(7).  Sky's Plan is not confirmable for this reason alone.  Having found that Sky's plan does not satisfy §§ 1129(a)(3) and (7), the Court need not address the Debtor's argument that the plan fails to satisfy the cramdown provisions in § 1129(b).

## V.    Confirmability of the Debtor's Plan.

Sky argues the Debtor's Plan is not confirmable because:  a) Section 7.15 of the plan violates the unfair-discrimination test for cramdown as between Sky and the Hapsis Trust, under § 1129(b)(1); b) the plan fails to satisfy the fair-and-equitable test for cramdown as to Sky, under § 1129(b)(1); c) Section 7.16 of the plan fails to meet the <u>Dow Corning</u> factor test applicable to third-party bar orders; and d) the plan is not feasible under § 1129(a)(11).  The Court concludes these arguments are unmeritorious as discussed below.

### A.    Whether, for purposes of cram down, Section 7.15 of the Debtor's Plan unfairly discriminates against Sky Enterprises, under § 1129(b)(1).

"Section 1129(b)(1) permits confirmation of a plan over the objection of a class of creditors if the plan does not 'discriminate unfairly' and is 'fair and equitable' with regard to the objecting class." <u>In re Riddle</u>, 444 B.R. 681, 685 (Bankr. N.D. Ga. 2011).  The unfair-discrimination

condition "has little, if any, significance in the context of a secured claim."  Id. at 686 (bracketing added).  This is "[b]ecause each secured creditor has collateral, repayment terms, and other rights that are unique to it[.]"  Id.  "The propriety of the treatment of a secured claim is not generally determined by reference to the treatment of other secured claims."  Id.  "Nothing requires that a plan provide treatment for every secured claim with the same maturity date, rate of interest, payment schedule, or any other term."  Id.  "So a secured creditor must show something other than the uniqueness of its treatment to establish unfair discrimination."  Id.

Here, Sky contends that:  a) it must wait until the effective date of the Debtor's Plan to receive a monthly payment, while the Hapsis Trust is paid much sooner; and b) Sky's only recourse in the event of a default is self-liquidation under Section 7.15, while the Mediated Settlement Agreement bestows the Trust with relief from the stay immediately upon a default.

The Court first notes that forcing Sky, and every other creditor besides the Hapsis Trust, to wait until the effective date of the plan is not "unfair" for purposes of § 1129(b)(1).  Turning to Sky's recourse in the event of a default, under Section 7.15, the occurrence of a material default requires the Property to be listed with a licensed broker and, within ninety (90) days of the listing, the Debtor must enter a contract for sale at a price sufficient to satisfy all claims in full.  If the Debtor is unable to self-liquidate at such a price, the Debtor consents to the appointment of a liquidating professional by the Court.  The intent of this provision is to allow the Debtor to liquidate the Property in the hopes of attaining the highest possible sale price for the benefit of its creditors and interest holders.  The Court notes that, under either outcome, the liquidating sale would be subject to Court approval.

Sky argues that more than a year could pass before a self-liquidating sale closed since the first payment to Sky is not due until 180 days after confirmation becomes final.  However, Sky

purchased its claim while the Debtor was in bankruptcy. The risk of having to wait longer to receive the return on its investment is an unavoidable risk of buying a debt owed by a debtor in bankruptcy. Moreover, Section 7.15 helps to ensure all creditors (and equity holders) can be repaid from the sale of the Property.

As to the Hapsis Trust's ability to enforce its lien immediately upon default, the plan calls for the Trust to be paid in full as early as November 2021 or as late as November 2022. But the Trust's lien rights are junior to Sky's. If the Hapsis Trust enforces its lien rights in a manner that circumvents the self-liquidating provision of Section 7.15, Sky's claim would have to be paid in full for the Trust to receive anything. While the Mediated Settlement Agreement does create a dichotomy between the Hapsis Trust and all other creditors, the Court is not convinced the ability of the Trust to enforce its lien rights constitutes "unfair discrimination" against Sky because Sky's lien rights are superior to the Trust's.

### B. Whether, for purposes of cram down, Debtor's Plan is "fair and equitable" as to Sky Enterprises, under § 1129(b)(1).

As applied to a class of secured claims (i.e., Sky's claim) under § 1129(b)(2)(A), the three non-exclusive alternatives for meeting the "fair and equitable" requirement are: (i) the creditor keeps all liens and receives payments equal to the *present* value of the creditor's interest in estate property; (ii) if there is a sale of the collateral, the creditor retains liens on the proceeds from the sale and receives payment equal to the creditor's interest in such proceeds; or (iii) the creditor receives the "indubitable equivalent" of its claims. 11 U.S.C. § 1129(b)(2)(A) (2019); 6 Norton Bankr. L. & Prac. 3d § 113:13 (July 2021). Because the Debtor's Plan does not provide for the sale of the Property, the second alternative under § 1129(b)(2)(A)(ii) is not relevant. The Debtor's Plan meets both the first and third alternatives under § 1129(b)(2)(A)(i) and (iii), respectively— either of which standing alone is sufficient.

Here, under § 1129(b)(2)(A)(i), the first alternative is met because Sky retains its liens and will receive cash payments equaling the present value of Sky's interest in the Property.  Sky argues the Debtor's Plan takes away its lien rights by stripping "covenants" where the Debtor's Plan provides, "All other covenants of any underlying note or mortgage shall not be effective after the Effective Date."  (Doc. 472-1 at 9).  To be clear, Sky will retain all "liens" securing its claim as that term is defined under § 101(37), notwithstanding the above-quoted plan language concerning "covenants" or any other argument to the contrary.  However, this is of little relevance because the Debtor's Plan most certainly satisfies the third alternative under § 1129(b)(2)(A)(iii).

As to the third alternative, the Debtor's Plan undeniably satisfies § 1129(b)(2)(A)(iii) by giving Sky the indubitable equivalent of its claims—which is deferred cash payments over time plus reasonable interest to compensate Sky for the time-value of its money.  See In re Richfield 81 Partners II, LLC, 447 B.R. 653, 657 (Bankr. N.D. Ga. 2011) ("Thus the 'indubitable equivalent' under subsection (iii) is the unquestionable value of a lender's secured interest in the collateral.").  The interest rate at which the payments to Sky are amortized ensures that Sky receives the "present value" of the money it is owed even though that money is paid over time.  Moreover, there is tremendous equity in the Property, several times the value of Sky's interest in the Property, protecting Sky against default risk.  As a result, under either subsection (i) or (iii), the Debtor's Plan meets the fair-and-equitable test as to Sky's secured claim.

    **C.**    **Whether Section 7.16 of the Debtor's Plan satisfies the <u>Dow Corning</u> factor test concerning the permissibility of nonconsensual third-party bar orders.**

The Eleventh Circuit adopted the <u>Dow Corning</u> factor test in <u>In re Seaside Eng'g & Surveying, Inc.</u>, 780 F.3d 1070 (11th Cir. 2015) (applying <u>In re Dow Corning Corp.</u>, 280 F.3d 648, 658 (6th Cir. 2002)).  The test lists seven factors to consider when determining whether to approve

a nonconsensual bar order (or injunction).[9]  "[B]ankruptcy courts should have discretion to determine which of the <u>Dow Corning</u> factors will be relevant in each case."  <u>Id.</u>  "The factors should be considered a nonexclusive list of considerations, and should be applied flexibly, always keeping in mind that such bar orders should be used 'cautiously and infrequently,' and only where essential, fair, and equitable."  <u>Id.</u> (internal citations omitted).

Here, Section 7.16 of the Debtor's Plan bars creditors from interfering in the reorganization by preventing creditors from pursuing "a claim or debt that is dealt with under this Plan" against third parties "actively involved in the regular operations" of the Debtor's business.  (Doc. 472-1 at 20).  The intent is to prevent Sky from going after Mr. Stockton to collect on his personal guaranty of the Primary Mortgage Debt.  Section 7.16 satisfies all of the <u>Dow Corning</u> factors. However, the most critical factor, as applied here, is the third factor—which looks to whether the bar is "essential to reorganization, namely, [whether] the reorganization hinges on the debtor being free from indirect suits against parties who would have indemnity or contribution claims against the debtor," such as Mr. Stockton.  <u>Seaside</u>, 780 F.3d at 1079.  Sky has already filed suit against Mr. Stockton, even going so far as to serve process, at the courthouse, on the morning of the Debtor's confirmation hearing.  A judgment against Mr. Stockton would permit Sky to levy against Mr. Stockton's ownership equity in the Debtor and provide Sky yet another avenue to go after the Property.  Such a result will deplete the Debtor's main asset and crush its reorganization efforts. Thus, it is clear Section 7.16 is essential to this reorganization.

---

[9] Broadly speaking, "a bar order extinguishes extraneous claims against the settling party, tying up the settling party's loose ends and encouraging resolution in complex cases that could otherwise span years.  But a bar order buys peace at a high price:  It bars potentially valid claims that non-settling parties could assert against the settling party."  <u>Sec. & Exch. Comm'n v. Quiros</u>, 966 F.3d 1195, 1197 (11th Cir. 2020).  <u>Quiros</u> dealt with a settlement rather than bankruptcy plan confirmation.  However, the core principles defining a bar order apply as equally to a debtor seeking plan confirmation as they do to a settling party.

Sky points to the Court's prior decision in In re Stein Mart, Inc., 629 B.R. 516, 524-525 (Bankr. M.D. Fla. 2021) (discussing nonconsensual bar orders and consensual releases).  However, the claims barred by Section 7.16 are extremely limited in scope.  Section 7.16 is functionally minuscule in comparison to the Stein Mart case.  Further, Section 7.16 ceases to apply if the Debtor defaults under the plan.  The Court sees no legal basis to deny confirmation of the Debtor's Plan based on the bar/injunction contained in Section 7.16.  In sum, the instant bar satisfies all of the Dow Corning factors.

> **D.**     **Whether Debtor's Plan is feasible under § 1129(a)(11).**

Section 1129(a)(11) contains the "feasibility" requirement for confirmation.  11 U.S.C. § 1129(a)(11) (2019); 6 Norton Bankr. L. & Prac. 3d § 112:28 (July 2021).  "To establish feasibility the court must find that '[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan[.]'"  In re D & G Invs. of W. Florida, Inc., 342 B.R. 882, 885 (Bankr. M.D. Fla. 2006). This requirement "is designed primarily to prevent confirmation of visionary schemes that promise a greater distribution than the debtor or plan proponent could ever attain."  In re JRV Indus., Inc., 344 B.R. 679, 683 (Bankr. M.D. Fla. 2006).  "The use of the word, likely, requires the Court to assess whether the plan offers a reasonable 'probability of success, rather than a mere possibility.'"  In re Diplomat Constr., Inc., 2009 WL 6498180, at *2 (Bankr. N.D. Ga. Nov. 20, 2009) (quoting In Kent Terminal Corp., 166 B.R. 636, 650 (Bankr. S.D.N.Y. 1994)).  That is, the proponent must show the plan offers "a reasonable prospect of success and . . . is workable."  D & G, 342 B.R. at 885-86.  However, "[t]he mere potential for failure of the plan is insufficient to disprove feasibility."  Id. at 886.  More specifically, "a court looks at:  the earning power of the business,

its capital structure, the economic conditions of the business, the continuation of present management, and the efficiency of management in control of the business after confirmation." Id.

Here, the Debtor's present net operating income is sufficient to meet its payments under its plan.  However, the Court fully expects the Debtor and Mr. Stockton to maximize the Property's income.  Doing so requires bringing the additional rooms up to standard for rental as short-term Airbnb rooms.  Mr. Stockton testified he intends to do this and has spent time/money bringing additional rooms online for Airbnb rental.  Mr. Stockton is fully capable of accomplishing these tasks.  Every tool and opportunity to complete this plan is at the Debtor's disposal.  However, the Court cautions against the donation of rooms during the life of the plan.  The time for altruism will come after the debts are paid, and the encumbrances are lifted.  Given these facts, the Debtor's Plan has a reasonable probability of success and is workable.  Finally, even if the Debtor defaults under the plan, the Property retains sufficient value to pay all creditors in full under the self-liquidation provision in Section 7.15 of the Debtor's Plan.  Given: a) the Debtor's net operating income and b) the value of the Property combined with the plan's self-liquidation provision, there is no doubt the plan is feasible under § 1129(a)(11).

VI.     **Sky Enterprises' Motion to Dismiss or Convert.**

In its response to confirmation of the Debtor's Plan, Sky stated it "will respectfully rest on its papers filed and the evidence cited herein in support of the dismissal or conversion of Debtor's proceeding." (Doc. 479 at 30).  Sky's motion cites the following bases for dismissal or conversion: a) failure to pay taxes under § 1112(b)(4)(I); b) unauthorized use of cash collateral under § 1112(b)(4)(D); c) gross mismanagement of the estate under § 1112(b)(4)(B); d) filing the Chapter 11 petition in bad faith; and e) failure to comply with an order of the Court under § 1112(b)(4)(E).

(Doc. 239).  None of these bases are supported by the facts or the law.  Sky did not present evidence to support these bases, and the Court is not persuaded that any cited basis applies in this case.

### Conclusion

As to the Property's value, the Court concludes the income capitalization approach makes the most sense in this situation.  The facts demonstrate a value, as of the confirmation date, of at least $4.75 million.  The value of Sky's secured claim is $811,372.40, encompassing the principal balance of $741,960.76, accrued interest of $19,411.64, and attorney's fees of $50,000.00.

The Court further concludes Sky's Plan is not confirmable for the reasons stated above. In contrast, the Debtor's Plan meets all the requirements for confirmation.  Further, even assuming Sky's Plan was confirmable, § 1129(c) requires the Court to confirm the Debtor's Plan in light of the overwhelming and reasonable creditor preferences in this case.  The Motion to Dismiss or Convert will be denied.  The Court will enter separate orders on Debtor's Motion to Value Real Property, Sky's Motion to Determine Amount of Secured Claim, and Sky's Motion to Dismiss or Convert.  The Debtor is directed to submit a confirmation order.